# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GINA BALASANYAN; NUNE NALBANDIAN, on behalf of themselves all others similarly situated,<br><br>           Plaintiffs,<br><br>  v.<br><br>NORDSTROM, INC., a Washington corporation; and DOES 1-100, inclusive,<br><br>           Defendants.<br>_____<br><br>GINO MARAVENTANO; and NEESHA KURJI,<br>           Plaintiffs,<br>  v.<br><br>NORDSTROM, INC., a Washington corporation; and DOES 1-100, inclusive,<br><br>           Defendants. | Case Nos. 3:11-cv-2609-JM (WMC)<br>          3:10-cv-2671-JM (WMC)<br><br>**ORDER GRANTING PLAINTIFFS' MOTIONS FOR CLASS CERTIFICATION OF THE PROPOSED CALIFORNIA CLASSES, DENYING PLAINTIFFS' MOTION FOR CERTIFICATION OF THE NATIONWIDE CLASS, AND STRIKING BOEDEKER'S REPORT** |

On March 6, 2013, plaintiffs Gino Maraventano, Neesha Kurji, Gina Balasanyan, and Nune Nalbandian (together, "Plaintiffs") filed a motion to certify classes in two proposed class action lawsuits, Case No. 3:11-cv-2609 ("Balasanyan") and Case No. 3:10-cv-2671 ("Maraventano") against Nordstrom,

Inc. ("Nordstrom"). The Balasanyan complaint was originally filed in Los Angeles Superior Court on April 5, 2011, then removed to federal court, and later transferred to this district on November 9, 2011. The Maraventano complaint was originally filed in San Diego Superior Court, North County, in October 2010 and was removed to this court in December 2010. For the reasons stated below, the motions for certification are granted for the proposed California classes and subclass and denied for <u>Balasanyan</u>'s proposed nationwide class. In addition, the Boedeker Declarations (<u>Maraventano</u>, Dkt. 99, Attachment 5; <u>Balasanyan</u>, Dkt. 91, Attachment 8), which were submitted by Nordstrom, are stricken for failure to comply with Magistrate Judge William McCurine, Jr.'s orders requiring that expert reports be disclosed by January 18, 2013 (<u>Balasanyan</u>, Dkt. 71 as modified by <u>Maraventano</u>, Dkt. 78).

## I. BACKGROUND

### A. *Nordstrom's Compensation Structure*

#### 1. Commission Compensation with Minimum Draw Guarantee

Nordstrom's salespeople are paid on commission rather than at an hourly rate. Maraventano First Amended Complaint ("MFAC") ¶ 11. However, Nordstrom's salespeople are guaranteed a "minimum draw," or an average pre-determined hourly rate, whether or not they sell merchandise. Maraventano Motion for Class Certification ("MMCC") at 2. Nordstrom calculates each salesperson's commissions at the end of each period and compares their commissions with the guaranteed minimum draw that they would have received had they been working at an hourly rate. MFAC ¶ 21; Balasanyan Second Amended Complaint ("BSAC") ¶¶ 12-15. If a given employee's commissions per selling hour equals or exceeds their guaranteed minimum, Nordstrom pays

commissions.  MFAC ¶ 21; BSAC ¶ 51.  If that employee's commissions per selling hour do not equal or exceed the guaranteed minimum draw rate, Nordstrom pays the employee with his or her commission plus the amount necessary to bring them to the guaranteed minimum draw rate for all sell time. MFAC ¶ 21; BSAC ¶ 51.  For example, if the minimum draw rate was $10.85 per hour and the employee was working 10 hours, an employee would need to make over $108.50 in commissions to be paid solely on commissions and earn above the minimum draw.  Otherwise, the employee would be paid $10.85 per hour for his or her time.

## 2. Pre-Opening and Post-Closing Hours

Sell time can include up to 40 minutes of pre-opening and post-closing time.  MFAC ¶¶ 14-18; BSAC ¶¶ 12-15.  Pre-opening and post-closing activities include writing thank you notes to customers, addressing invitations to customers regarding upcoming sales events, calling customers to thank them for their business, attending store rallies and certain meetings, walking the sales floor to familiarize him or herself with merchandise, putting away shoes that customers did not purchase, putting shoes on display, organizing mismatched shoes, taking tissue paper out of shoes, and cleaning and dusting tables on the sales floor.

Plaintiffs claim that they were unable to make sales during the pre-opening and post-closing hours included in sell time because the stores were not open and that this time should have therefore been considered non-sell time.[1]  However,

---

[1] By including additional time as sell time, Plaintiffs also needed to sell slightly more merchandise to meet the minimum draw rate.  Though the difference needed to surpass the minimum draw rate was likely small, this difference would have been provided to Plaintiffs in addition to an hourly rate for the pre-opening or post-closing time. For example, if a salesperson worked 8.67 hours, .67 hours of which was pre-opening time, at a minimum draw rate of

Nordstrom claims that its doors are generally open 10 minutes before the posted opening time and closed 10 minutes after the posted closing time. MMCC at 4; Balasanyan Motion for Class Certification ("BMCC") at 4. Plaintiffs dispute this claim. MMCC at 4; BMCC at 4. But even if Nordstrom stores opened 10 minutes before posted opening and closed 10 minutes after posted closing, Plaintiffs explain that they were purportedly still unable to earn commissions during the additional 30 minutes that they were required to work before opening or after closing. MMCC at 4.

### 3. Stock Assignments

In addition to pre-opening and post-closing hours, sell time can include up to 30 minutes of daily stock assignments. MFAC ¶ 21; BSAC ¶ 12. Managers give stock assignments during pre-opening and post-closing time as well as during store operating hours. BMCC, Nalbandian Decl. ¶ 11; Answer to BSAC ¶ 13 (conceding that stock assignments "sometimes occur before the store doors open to the public or after the store is closed to the public"). Plaintiffs further allege that stock assignments occurred each shift and lasted, on average, between fifteen (15) and forty-five (45) minutes. BMCC, Boenzi Decl. ¶ 6; BMCC, Nalbandian Decl. ¶ 11; BMCC, Balasanyan Decl. ¶ 13.

Stock assignments may include "checking merchandise, preparing the sales floor, opening and closing registers, putting away and taking out merchandise

---

$10.85, she would need to sell enough to make more than $94.07 in commissions before being paid on commission and in excess of the minimum draw rate. If the .67 hours of pre-opening time was excluded, then she would need to make more than $86.80 in commissions and would have also earned an additional $7.27 of non-sell time pay. So if she had earned anything above $86.80 in commissions, that salesperson was owed additional wages, up to $7.27, under Plaintiffs' theory.

onto the sales floor and picking up or dropping off alterations, along with a variety of other sales-related activities." Answer to BSAC ¶ 13. By Nordstrom's own definition, salespeople are not available to service customers during these assignments.[2] MMSJ, Ex. 9 at 21. Accordingly, Plaintiffs claim that they were precluded from making any sales during stock assignments. BSAC ¶ 35. However, Plaintiffs' numerous declarations vary widely in this regard.[3]

While Nordstrom's official policy provides that salespeople may be asked to perform up to 30 minutes of stocking per shift, compensated only with commission, Nordstrom insists that stock assignments do not preclude employees from making sales and are not uniformly assigned once per shift.[4] Opp. BMCC at 6:3-17; Opp. BMCC at 13:2-8. In fact, Nordstrom insists stock assignments come second to assisting customers and occur only infrequently if at all. Id. Nordstrom claims that many draw commission employees do not receive stock

---

[2] Nordstrom defines stock assignments as follows: "Stock assignments are considered part of the selling process and are included in the calculation of your sales per hour. You may be asked to spend up to thirty (30) minutes of selling time for a stock assignment during your scheduled shift, which is inclusive of any time before or after store hours. Normal department maintenance during which you are still available to service the customer, does not count towards these thirty (30) minutes." MMSJ, Blumenthal Decl., Ex. F (Excerpt from Nordstrom's "Fruit of Your Labor" packet).

[3] BMCC, Nalbandian Decl. ¶ 11 ("I estimate that on average I spend between fifteen (15) and forty-five (45) minutes on stock assignments per shift."); BMCC, Balasanyan Decl. ¶ 13 ("I regularly spend between fifteen (15) and forty-five (45) minutes performing stock assignments. If I am assigned an opening or closing shift, I spend another forty (40) minutes engaging in stock assignments."); BMCC, Boenzi Decl. ¶ 9 ("During each shift, I would perform more than thirty (30) minutes of stock assignments, and at times I would spend up to one (1) hour per shift on stock assignments."); BMCC, Mahdi Decl. ¶ 6 ("I would routinely spend between forty-five (45) minutes and one (1) hour each shift performing these stock[] assignments.").

[4] Nordstrom generally refers to stock assignments as "daily duties" but does not admit that assignments are uniformly assigned. Answer to SAC ¶ 12.

assignments and that the assignments vary greatly from department to department in terms of frequency, duration, and tasks performed.[5]

### 4. Non-Sell Time

Nordstrom's policy provides that employees should be compensated at an hourly rate for all non-sell time, which includes pre-opening and post-closing activities in excess of 40 minutes, stock assignments in excess of 30 minutes, and meetings.[6] MFAC ¶ 21; BSAC ¶ 16. Specifically, Nordstrom policy states that "[m]eetings are considered non-sell hours. This means meetings are paid at [an employee's] non-sell hourly rate and are not included in the calculation of [that employee's] commission." BMCC, Ex. 5 at 82.

---

[5] Opp. BMCC, Rezkalla Decl. ¶ 22 ("I do not give 'stock assignments.' The St. John department does not have a large back stock room where we store merchandise, like some departments. Most of our merchandise is on the sales floor. The tasks St. John salespeople perform when customers are not present generally takes place on the sales floor or are for just a short period of time in the back area."); Id. ¶ 23 ("I tell my sales team to prioritize customers who need help over other tasks that can be done at another time. No one on my sales team should fail to greet a customer who is on the floor or assist a customer who calls because they are working on some other task."); Opp. BMCC, Bodaken Decl. ¶ 21 ("I do not give out 'stock assignments.' We do not sell merchandise that we keep in a back stock room in the same way that a shoe or handbag department might."); Id. ¶ 24 ("I tell my team regularly that customers who are present in the department (or on the phone) are the top priority over other tasks. None of their work tasks on selling time should ever interfere with or prevent a salesperson from immediately greeting and assisting a customer."); Opp. BMCC, King Decl. ¶ 5 ("When I was the Department Manager, I did not give . . . stock assignments every day and never gave stock assignments that lasted 30 or more minutes. I only gave out stock assignments periodically when needed."); Id. ¶ 7 ("I put a 15-minute cap on stock assignments.").

[6] The parties refer to meetings by a variety of terms (including "department meetings," "the United Way meeting," "the State of the Company meeting," "Annual Performance Reviews," "pay period chats," business reviews," "opportunity checks," and "coaching conversations") but do not clarify the distinctions. Opp. BMCC, Gonzalez Decl. ¶¶ 11-15; BMCC, Ex. 5 at 13, 52-53. It is unclear whether the term "staff meetings," which the <u>Balasanyan</u> Plaintiffs used in their second amended complaint, encompasses all or only some of the aforementioned meetings.

However, the <u>Balasanyan</u> Plaintiffs claim that Nordstrom violated its own policy by regularly requiring employees to attend "staff meetings" and to perform stock assignments and pre-opening and post-closing assignments without allowing them to clock-in at their hourly rates. Specifically, the <u>Balasanyan</u> Plaintiffs allege that they are regularly required to be away from the sales floor to attend fifteen (15) to twenty (20) minute evening staff meetings. BSAC ¶ 15. Although Nordstrom encourages meetings, it does not appear to have a specific policy specifying the frequency or duration of these meetings. Some meetings, at least, appear to be at the discretion of store managers. Opp. BMCC, Arias Decl. ¶ 13 ("The company recently shifted to encouraging managers to have more detailed, but less frequent, business reviews in place of pay period chats."). Moreover, the parties failed to provide information about the frequency or duration of any other meetings and to clarify which meetings qualify for non-sell time and why.

Plaintiffs also do not specify how often stock assignments exceeded 30 minutes, whether these extended assignments were properly recorded as non-sell time, or whether managers across all stores regularly prohibited employees from recording the assignments as non-sell time. Plaintiffs have also failed to provide any evidence indicating that mangers regularly prohibited employees from recording meetings as non-sell time.

### B. *<u>Maraventano</u> Named Plaintiffs*

Maraventano worked as a draw commission salesperson in the women's shoes department of Nordstrom's store in Escondido, California from October 2006 until June 2009. MMCC at 2. Kurji worked as a draw commission salesperson in the lingerie department of Nordstrom's store in Irvine, California

from October 2010 until December 2010.  Id. at 2.  Pursuant to Nordstrom's aforementioned compensation structure, Nordstrom paid Maraventano and Kurji for all designated sell time with commissions and for all designated non-sell time at an hourly rate.  Id. at 3.

### C. *Balasanyan* **Named Plaintiffs**

Balasanyan has worked as a draw commission salesperson in the St. John's department of Nordstrom's stores in Santa Anita and Glendale, California since 2004.  BMCC at 13.  Similarly, Nalbandian has worked as a draw commission salesperson in the men's department of Nordstrom's store in Glendale, California since 2004.  Id.  Both are current employees.  Id.  Nordstrom also paid Balasanyan and Nalbandian according to the previously discussed commission-based compensation structure.  Id.

### D. **Proposed Classes**

The Maraventano Plaintiffs wish to certify a class that includes "all persons employed by Nordstrom within the state of California from October 20, 2006 through the date of the trial who were or are paid on a draw commission basis" (the "Maraventano Class").  MMCC at 6.

The Balasanyan Plaintiffs wish to certify at least two classes and one subclass:

1. A class of all draw commission salespersons employed by Nordstrom within the state of California from October 20, 2006 through the date of trial ("California Class Period") who were or are paid on a draw commission basis (the "Balasanyan California Class").

2. As it is possible that some employees never worked a closing or opening shift and thus never participated in pre-opening or post-closing duties, a subclass of the first class of all draw commission salespersons employed by Nordstrom within the state of California during the California Class

Period who were or are paid on a draw commission basis for activities performed *during* store operating hours class (the "the <u>Balasanyan</u> California Subclass," and together with the <u>Maraventano</u> Class and the <u>Balasanyan</u> California Class, the "California Classes"); and

3. A class of all draw commission salespersons employed by Nordstrom nationwide from April 5, 2007 through the date of trial ("Nationwide Class Period") who were or are paid on a draw commission basis (the "Nationwide Class Members").[7]

BMCC at 3-4.

### E. *Maraventano and Balasanyan Claims*

The proposed Maraventano Class is composed only of California employees. The MFAC alleges that Nordstrom did not pay employees for "stocking time . . . unless they failed to meet their minimum commission draw."

---

[7] The <u>Balasanyan</u> Plaintiffs alternatively propose that the Nationwide Class can be divided into and certified as subclasses based on the seven applicable statute of limitations, as follows:

> (1) from April 5, 2010 to the present date (if within the state of Arizona);
>
> (2) from April 5, 2008 to the present date (if within the states Alaska, Colorado, Delaware, Maryland, or North Carolina);
>
> (3) from April 5, 2007 to the present date (if within the states of California, Pennsylvania or Texas);
>
> (4) from April 5, 2006 to the present date (if within the states of Florida, Kansas, Missouri, or Virginia);
>
> (5) from April 5, 2005 to the present date (if within the states of Connecticut, Georgia, Hawaii, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New York, Oregon, Tennessee, Utah or Washington);
>
> (6) from April 5, 2003 to the present date (if within the state of Ohio); and
>
> (7) from April 5, 2001 to the present date (if within the states of Illinois, Indiana or Rhode Island).

BMCC at 2.

MFAC ¶ 21.  The <u>Maraventano</u> Plaintiffs define "stocking time" to include stock assignments "performed prior to the store opening, during certain shifts, and/or after a sales shift."  It states four causes of action: (1) violation of California Labor Code § 1197; (2) violation of California Labor Code §§ 201-203; (3) willful violation of California Labor Code § 226; and (4) unfair business practices under California Business & Professions Code § 17200 *et seq*.

The Balasanyan complaint alleges that Nordstrom has underpaid its salespeople across the country by only compensating them for time spent on stock assignments, pre-opening, and post-closing periods through commissions earned, which they believe can only be used to compensate for commission producing activities.  BSAC ¶¶ 13, 14.  The noncommission-producing activities include performing marketing activities such as contacting customers to inform them of new product lines.  <u>Id.</u>  According to the BSAC, "[t]he combined time [Balasanyan] Plaintiffs and Class Members are required to engage in noncommission-producing activities totals at least one (1) hour and thirty (30) minutes per work shift" for which there is no compensation.  <u>Id.</u> ¶ 16.  The BSAC states six causes of action:  (1) nonpayment of wages under California Labor Code § 1194; (2) nonpayment of wages under 29 U.S.C. § 206 (the Fair Labor Standards Act, or "FLSA"); (3) breach of contract; (4) declaratory relief under California Code of Civil Procedure § 1060; (5) ) unfair business practices under California Business & Professions Code § 17200 *et seq*.; and (6) a PAGA claim under California Labor Code § 2699.  The <u>Balasanyan</u> FLSA claim was later dismissed by this court.  <u>See</u> Dkt. 76.

The <u>Balasanyan</u> Plaintiffs assert only the breach of contract claim on behalf of the proposed Nationwide Class, though the <u>Balasanyan</u> Plaintiffs had

previously sought to assert the now dismissed FLSA on behalf of the Nationwide Class.  The <u>Balasanyan</u> Plaintiffs allege that Nordstrom breached its contracts with their salespeople by failing to compensate them for stock assignments lasting more than 30 minutes and meetings by compensating that work only through commissions and not the non-sell time hourly rate.  The <u>Balasanyan</u> Plaintiffs' proposed California classes assert all other claims as well as the breach of contract claim.

## II. LEGAL STANDARD

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2550 (2011) (citing <u>Califano v. Yamasaki</u>, 442 U.S. 682, 700-01 (1979)).  To qualify for the exception to individual litigation, the party seeking class certification must provide facts sufficient to satisfy the requirements of Federal Rules of Civil Procedure 23(a) and (b).  <u>See</u> <u>Zinser v. Accufix Research Inst., Inc.</u>, 253 F.3d 1180, 1186 (9th Cir. 2001); <u>Doninger v. Pac. Nw. Bell, Inc.</u>, 564 F.2d 1304, 1308-09 (9th Cir. 1977).  Rule 23(a) requires Plaintiffs to demonstrate that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  <u>See</u> Fed. R. Civ. P. 23(a).

Rule 23(b)(3) requires the court to find that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  <u>See</u> Fed. R. Civ. P.

23(b)(3). The court considers "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Wal-Mart Stores, Inc., 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L. Rev. 97, 131 (2009)). The district court must conduct a rigorous analysis to determine whether the prerequisites of Rule 23 have been met. See Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982). It is a well-recognized precept that "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Wal-Mart Stores, Inc., 131 S. Ct. at 2551-52 (quoting Falcon, 457 U.S. at 160). "The district court is required to examine the merits of the underlying claim in this context [class certification], only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 n.8 (9th Cir. 2011) (citations omitted). Rather, the court's review of the merits should be limited to those aspects relevant to making the certification decision on an informed basis. See Fed. R. Civ. P. 23 advisory committee notes. The court must consider the merits if they overlap with the Rule 23 requirements. See Ellis, 657 F.3d at 981 (citing Wal-Mart Stores, Inc., 131 S. Ct. at 2551-52; Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992)). If a court is not fully satisfied that the requirements of Rules 23(a) and (b) have been met, certification should be refused. See Falcon, 457 U.S. at 161.

## III. DISCUSSION

### A. *Rule 23(a) Class Certification Requirements*

### 1. Numerosity

Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticability does not mean impossibility," rather the inquiry focuses on the difficulty or inconvenience of joining all members of the class. Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913-14 (9th Cir. 1964). In determining whether numerosity is satisfied, the court may consider reasonable inferences drawn from the facts before it. See Gay v. Waiters' & Dairy Lunchmen's Union, 549 F.2d 1330, 1332 n.5 (9th Cir. 1977) (citing Senter v. General Motors Corp., 532 F.2d 511, 523 (6th Cir. 1976)). A proposed class is ascertainable for class certification if it "identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself as having a right to recover based on the description." Estrada v. FedEx Ground Package System, Inc., 154 Cal. App. 4th 1, 14-15 (2007) (citing Bartold v. Glendale Fed. Bank, 81 Cal. App. 4th 816, 828 (2000)).

Plaintiffs indicate that the proposed Maraventano Class, the Balasanyan California Class and Subclass Members, and the Nationwide Class Members appear to include over 20,000 individuals employed by Nordstrom during the California Class Period who were or are paid on a draw commission basis. MMCC at 11; BMCC at 10. The proposed Nationwide Class allegedly includes an additional 60,000 employees. BMCC at 10. These numbers far exceed the level of practicable joinder.

Nordstrom counters that these classes are overbroad and thus not ascertainable because there is no reliable way to identify which salespeople engaged in tasks that precluded them from making sales while on sell time. MMCC, Blumenthal Decl. ¶ 16; BMCC, Blumenthal Decl. ¶ 16. Yet, Nordstrom's own policy on stocking time compensated employees separately for stock assignments lasting more than 30 minutes, thereby recognizing that stock assignments might preclude employees from making sales. This argument also does not address Plaintiffs' pre-opening and post-closing time claims.

Here, the class description sufficiently identifies common characteristics so that members may easily identify themselves. And, as Nordstrom's internal system categorizes all employees by specific position title, Nordstrom may check the supposed class members against its own records. BMCC at 10-11 (citing Shamtoub Decl., Ex. 3 Blumenthal Deposition 2.28 at 50:21-51:5; 53:1-2; 54:1-8; 56:3-6). The large size of the proposed classes renders individual joinder impracticable. Plaintiffs have therefore satisfied this requirement.

## 2. Commonality

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" <u>Wal-Mart Stores, Inc.</u>, 131 S. Ct. at 2551 (quoting <u>Falcon</u>, 457 U.S. at 157). This "does not mean merely that they have all suffered a violation of the same provision of law." <u>Wal-Mart Stores, Inc.</u>, 131 S. Ct. at 2551. The "claims must depend on a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution - - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u> "The existence of shared legal issues with divergent factual predicates is sufficient

[to satisfy commonality], as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). "All questions of fact and law need not be common to satisfy the rule." See id. Rather, commonality is satisfied "if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." See Rodriguez v. Hayes, 591 F.3d 1105, 1122 (9th Cir. 2010) (citing Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 56 (3d Cir. 1994)).

### a. California Classes

Plaintiffs explain that the shared legal issue is whether Nordstrom may compensate draw commission employees with commissions for pre-opening and post-closing work and stock assignments performed during store hours because they cannot earn commissions during these times. MFAC ¶¶ 14-18; BSAC ¶¶ 12-15. As a result, Plaintiffs explain that they have suffered the same injury, underpayment, due to Nordstrom's allegedly improper commission compensation structure. Plaintiffs assert that the common questions of fact and law include but are not limited to whether Nordstrom: (1) maintains a uniform written commission plan applicable to all draw commission employees; (2) directly compensates draw commission employees for each hour worked; (3) fails to directly compensate draw commission employees for each hour worked by way of its commission compensation structure; and (4) violates California minimum wage law by failing to directly compensate employees for pre-opening hours, post-closing hours, and/or stock assignments. BMCC at 12.

Nordstrom argues that Plaintiffs have failed to show commonality for the California Classes because the claims falsely presume that salespeople are precluded from selling during pre-opening and post-closing hours and stock

assignments during store hours.  Opp. BMCC at 1.  Nordstrom further argues that Plaintiffs have failed to show commonality because liability turns on individualized facts, such as possible variations in whether an employee actually sold products during pre-opening, post-closing, or stocking time.  Opp. BMCC at 8-9.  Clarification, Nordstrom asserts, would require individual determinations for each salesperson, resulting in tens of thousands of mini-trials.  Opp. BMCC at 9-10.

The court finds that the dispute turns on matters that apply to the class as a whole, not on individualized facts.  Nordstrom's policy is undisputed.  The common question is whether salespeople were able to sell to customers during pre-opening, post-closing, and stocking time, and consequently whether they should be compensated for that time with commissions as opposed to a separate hourly rate.  Before stores open and after stores close, salespeople appear to have a significantly impaired ability to sell to customers.  Similarly, salespeople may have a difficult time selling to customers when they are not available to customers.  Minor variations on a theme, such as the precise activities that salespeople were engaging in when they were unavailable to customers either because the store was closed or they were completing a stock assignment, should not contain the seeds of destruction for a putative class.  See Hanlon, 150 F.3d at 1019 ("The existence of shared legal issues with divergent factual predicates is sufficient [to satisfy commonality] . . . .").  In fact, "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  Wal-Mart Stores, Inc., 131 S. Ct. at 2551-52 (quoting Falcon, 457 U.S. at 160).

16

As the claims arise from Nordstrom's official policies and requirements, uniformly applied to all draw commission employees, both the named Plaintiffs and the prospective class share common complaints and allege common injuries. Accordingly, Plaintiffs share a common contention and have thus satisfied this requirement for the proposed California Classes.

### b. Nationwide Class

The Balasanyan Plaintiffs explain that the common contention at issue for the Nationwide Class is whether Nordstrom breached its employment contracts with its draw commission employees by failing to compensate them for certain work during which they could not sell, including meetings and stock assignments that exceeded 30 minutes per shift, at the hourly non-sell rate because Nordstrom managers prevented employees from properly recording it as non-sell time. BSAC ¶ 24, 59. The Balasanyan Plaintiffs also claim that it is unreasonable to require employees to "watch the clock" to determine when a stock assignment should be changed to non-sell time. Reply BMCC at 8-9. The Balasanyan Plaintiffs insist that any variations are "simply a matter of damages, which are readily calculable through, among other things, Nordstrom's employee records and trusted survey methodology." BMCC at 3.

The Nationwide Class appears to assert a violation of the same provision of law. If members of the Nationwide Class were in fact unable to record time spent on meetings and stock assignments over 30 minutes, then they would have common facts on which to base their breach of contract claim. Accordingly, the Balasanyan Plaintiffs have satisfied the commonality requirement for the proposed Nationwide Class.

### 3. Typicality

Rule 23(a)(3) requires the representative party to have claims or defenses that are "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." Rodriguez, 591 F.3d at 1124 (citations omitted). The typicality requirement is permissive and requires only that the representative's claims are "reasonably co-extensive with those of the absent class members; they need not be substantially identical." Hanlon, 150 F.3d at 1020. "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted).

### a. California Classes

Here, Plaintiffs seek to represent Nordstrom employees whose claims are nearly identical to their own. Balasanyan, Kurji, Maraventano, and Nalbandian each work or worked as a draw commission salesperson in four of Nordstrom's California stores. MMCC at 14; BMCC at 13. Nordstrom compensated all proposed members of the California Classes, including Plaintiffs, pursuant to a plan that paid commission for designated sell time and an hourly wage for designated non-sell time. MMCC at 14-15; BMCC at 13-14. Critically, Nordstrom defined sell time to include pre-opening, post-closing, and stocking time, during which Plaintiffs and the proposed members of the California Classes were allegedly precluded from earning a commission either because Nordstrom's stores were closed to the public or because stock assignments kept them from customer contact and thus from sales. MMCC at 15; BMCC at 14. This

compensation structure has been, and continues to be, applied by Nordstrom to all draw commission employees, including Plaintiffs and the proposed members of the California Classes. Id. Plaintiffs seek damages on behalf of themselves and the class and subclass for work performed during pre-opening, post-closing, and stocking time. MMCC at 15; BMCC at 14.

Nordstrom argues that Plaintiffs fail to show that their experiences are typical of the experiences of more than 27,000 California draw commission salespeople at 32 different stores. Opp. MMCC at 21; Opp. BMCC at 24. That Plaintiffs constitute a relatively small sample of the large proposed California Classes is not a valid reason to deny class certification. Nordstrom further claims that the fact that Plaintiffs were subject to the same commission pay plan is insufficient because liability turns not on the pay plan itself, but on whether salespeople were precluded from selling. Id. at 22. However, Nordstrom has not explained why that inquiry is inappropriate for class resolution.

Nordstrom claims that no Plaintiff is typical of the proposed class. Nordstrom maintains that Balasanyan and Nalbandian are not typical because they work in only two departments in two separate stores, but it does not explain why this is not typical of the proposed class. Opp. BMCC at 25. If Nordstrom is implying that most of its salespeople work in multiple departments, then it has not offered any evidence demonstrating that to be the case. Otherwise, no named proposed named plaintiff would be typical for this action.

Nordstrom further maintains that Kurji is not typical because she worked at a single store for only two months. Opp. MMCC at 22. While Nordstrom employed Kurji for the shortest period of time of all Plaintiffs, Nordstrom fails to further elaborate on why she is not typical of the proposed class. See Kamar v.

19

Radio Shack Corp., 254 F.R.D. 387, 396 (C.D. Cal. 2008) ("Given the common policy, the fact that there have been variations in meetings attended, scheduled shifts, and actual hours of work does not defeat typicality."). Presumably, the length of each salesperson's employment varied. In fact, the duration of Kurji's employment seemingly affects only the calculation of damages, which is insufficient to defeat typicality. See id.

Nordstrom also maintains that Maraventano is not typical because he only worked in a single department at one store and was terminated for failing to meet sales goals. Opp. MMCC at 22. Nordstrom claims that Maraventano's experience is "not typical of experienced, successful salespeople who comprise a key part of the class." Opp. MMCC at 22. Nordstrom fails to explain how Maraventano's sales record changes his experience with the commission compensation structure, or why that might affect his claims and defenses in this case. Surely, not every Nordstrom salesperson has been successful. Nordstrom also employed Maraventano for over two years, thereby reducing the potency of Nordstrom's argument.

Finally, Nordstrom argues that Plaintiffs are not typical because of their shared opinion "that the tasks at issue were not directly tied to sales is contrary to other employees' affirmations that the tasks are part of sales work." Opp. MMCC at 22; Opp. BMCC at 25. This misconstrues Plaintiffs' complaint, which focuses not on personal beliefs, but on whether Nordstrom may legally categorize activities that preclude sales as sell time. In addition, Nordstrom does not explain why these opinions prevent Plaintiffs from bringing claims typical to the proposed class, especially as class members are free to opt out of the class action. More importantly, Nordstrom has provided no case law supporting this theory that

personal belief somehow affects California labor law and unfair business practices claims.

While not addressed by the parties in their submissions, the court is concerned about whether the Maraventano Plaintiffs lack standing to seek injunctive relief under the fourth claim alleging Unfair Business Practices under Cal. Bus. & Prof. Code § 17200. "In a class action, the plaintiff class bears the burden of showing that Article III standing exists." (citing Bates v. UPS, 511 F.3d 974, 985 (9th Cir. 2007). "Plaintiffs must show standing with respect to each form of relief sought. Standing exists if at least one named plaintiff meets the requirement." Ellis, 657 F.3d at 978 (citing Bates, 511 F.3d at 985). To satisfy standing for a claim seeking injunctive relief, "[t]he plaintiff must demonstrate that he has suffered or is threatened with a concrete and particularized legal harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." Bates, 511 F.3d at 985 (internal citations and quotation marks omitted). The plaintiff must establish a "real and immediate threat of repeated injury." Id. (quoting O'Shea v. Littleton, 414 U.S. 488, 496 (1974)). "Past wrongs do not in themselves amount to a real and immediate threat of injury necessary to make out a case or controversy . . . [but] are evidence bearing on whether there is a real and immediate threat of repeated injury." Ellis, 657 F.3d at 979 (citing Bates, 511 F.3d at 985).

The Maraventano Plaintiffs, who are both former employees, cannot establish a sufficient likelihood that they will again be wronged by Nordstrom's allegedly improper conduct. MMCC at 14. As a result, the Maraventano Plaintiffs have no standing to pursue injunctive relief and, therefore, their claims are not typical of the proposed class. The only claim for which the Maraventano

21

Plaintiffs seek injunctive relief and therefore lack standing is their Unfair Business Practices under Cal. Bus. & Prof. Code § 17200.

Except for the standing issue outlined above, Plaintiffs are typical of the proposed California Classes and have therefore satisfied the typicality requirement. The claims and damages Plaintiffs allege on behalf of themselves and the California Classes all result from Nordstrom's policies and agreements with all draw commission employees and are therefore typical. Nordstrom's arguments against Plaintiffs are irrelevant to the claims and defenses typical of the proposed class.

### b. Nationwide Class

The <u>Balasanyan</u> Plaintiffs and the proposed Nationwide Class Members are subject to the same binding agreement found in Nordstrom's Commission Calculation Agreement, employee handbook, and new hire materials. BMCC at 14. These materials provide that Nordstrom will pay draw commission salespeople on an hourly basis for meetings and for stock assignments exceeding 30 minutes per shift. <u>Id.</u> The <u>Balasanyan</u> Plaintiffs were employed by Nordstrom as draw commission employees and worked under the same commission compensation structure and employment agreements as the proposed Nationwide Class Members. <u>Id.</u> at 14-15. Accordingly, the <u>Balasanyan</u> Plaintiffs assert that their claims arise from the same course of events and are similar to legal arguments available to the proposed class.

Nordstrom argues that Plaintiffs have failed to show that their experiences are typical of the experiences of more than 60,000 draw commission salespeople in 30 different states at 117 stores. Opp. MMCC at 24. Nordstrom offers no additional information as to why Plaintiffs fall short of typicality. Accordingly,

Plaintiffs are deemed typical of the proposed Nationwide Class and have therefore satisfied this requirement.

### 4. Adequacy of Representation

Rule 23(a) also requires the representative parties to "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The Ninth Circuit set a two-prong test for this requirement: "(1) [d]o the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Staton v. Boeing Co., 327 F.3d 938, 957 (9th Cir. 2003) (citing Hanlon, 150 F.3d at 1020).

Nordstrom does not object to the adequacy of class counsel but contends that Plaintiffs are not adequate representatives because "they were able to sell during the periods at issue and so cannot represent a class of salespeople who were precluded from selling." Opp. MMCC at 22; Opp. BMCC at 25. However, Nordstrom's only evidence to support this is a flawed expert report that this court has stricken as untimely. See infra Section III.B.2.a. Additionally, the court has already noted that the occasional sale appears to be the exception to the rule. Nordstrom's numerous declarations attesting otherwise were selected for the purposes of litigation and may not reflect the realities of most Nordstrom employees. While Nordstrom may ultimately be able to demonstrate that Plaintiffs were able to make sales regularly, Nordstrom has not yet done that conclusively.

Nordstrom contends that Balasanyan and Nalbandian are not adequate representatives because they expressed concern about time and financial commitment necessary to serve as class representatives if the litigation took place

23

in San Diego.  Opp. BMCC at 25 (citing <u>Balasanyan</u> Dkt. 12-2, Balasanyan Decl., and Dkt. 12-3, Nalbandian Decl.).  Yet, the court notes that those declarations were made in August 2011.  Almost two years have transpired since those statements were made, and both have continued to pursue this case vigorously. Balasanyan and Nalbandian's commitment to this case do not appear to be in doubt.

Nordstrom further argues that Maraventano "also cannot serve as the class representative on the wage statement penalties claim because his claims are barred by the one-year statute of limitations."  Opp. MMCC (Cal. Civ. Proc. Code § 340(a)).  However, this argument fails because Maraventano is also seeking actual damages under California Labor Code § 226.  <u>See</u> <u>Ricaldai v. US Investigations Servs.</u>, LLC, 878 F. Supp. 2d 1038, 1046 (citing <u>Singer v. Becton, Dickinson and Co.</u>, 2008 U.S. Dist. LEXIS 56326, at *11-14 (S.D. Cal. 2008)).

Finally, Nordstrom contends that it fired Kurji based on alleged falsification of commission information.  Opp. MMCC at 23 (citing Strauss Decl., Exh. A, Kurji Dep.182:4-184:8).  Nordstrom relies on <u>Savino v. Computer Credit</u>, 164 F.3d 81, 87 (2d Cir. 1998), in which the court held that a proposed named plaintiff had frequently changed his position on an issue central to the lawsuit.  <u>See</u> <u>id.</u> at 87.  Plaintiffs reply that Kurji vehemently denies having committed any fraud and that she was never convicted of any fraud.  Reply MMCC at 10.  Plaintiffs instead direct the court to <u>Harris v. Vector Mktg. Corp.</u>, 753 F. Supp. 2d 996, 1015 (N.D. Cal. 2010) (citing <u>Ross v. RBS Citizens, N.A.</u>, 2010 U.S. Dist. LEXIS 107779, at *14-15 (N.D. Ill. 2010) ("Where credibility has been considered, courts have generally found inadequacy only where the representative's credibility is questioned on issues directly relevant to the litigation or there are confirmed

examples of dishonesty, such as a criminal conviction for fraud.")).  In <u>Harris</u>, the court permitted Harris to act as a class representative because, although she had lied about certain matters related to the case, those matters were not directly related to the claims asserted.  <u>See</u> <u>id.</u> at 1015.  The <u>Harris</u> court concluded that no conflicts existed between Harris and the putative class and that Harris could be a fair and adequate representative.  <u>See</u> <u>id.</u> at 1015-16.  Although the accusations levied against Kurji are concerning, Plaintiffs are correct that Kurji was never convicted.  The court does not find that Kurji has any conflicts of interest with the putative class.

In sum, the court finds that Plaintiffs Maraventano, Kurji, Balasanyan, and Nalbandian are adequate class representatives.

## B.  *Rule 23(b)(3) Class Certification Requirements*

In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is appropriate under Rule 23(b)(1), (2), or (3).  <u>See</u> <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 614 (1997).  Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." <u>Hanlon</u>, 150 F.3d at 1022 (internal quotations omitted).  Rule 23(b)(3) calls for two separate inquiries: (1) do issues common to the class "predominate" over issues unique to individual class members, and (2) is the proposed class action "superior" to other methods available for adjudicating the controversy.  Fed. R. Civ. P. 23(b)(3); <u>Hanlon</u>, 150 F.3d at 1022.  In evaluating predominance and superiority, the court must consider: (1) the extent and nature of any pending litigation commenced by or against the class involving the same issues; (2) the interest of individuals within the class in controlling their own litigation; (3) the

convenience and desirability of concentrating the litigation in a particular forum; and (4) the manageability of the class action.  <u>See</u> Fed. R. Civ. P. 23(b)(3)(A)-(D); <u>Amchem</u>, 521 U.S. at 615-16.

## 1. Predominance

Rule 23(b)(3)'s predominance requirement is more stringent than Rule 23(a)(2)'s commonality requirement.  The analysis under Rule 23(b)(3) "presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2)."  <u>Hanlon</u>, 150 F.3d at 1022.  In contrast to Rule 23(a)(2), "Rule 23(b)(3) focuses on the relationship between the common and individual issues." <u>Id.</u>  Class certification under Rule 23(b)(3) is proper when common questions present a significant portion of the case and can be resolved for all members of the class in a single adjudication.  <u>Id.</u>  In other words, it is not enough to establish that common questions of law or fact exist, as it is under Rule 23(a)(2)'s commonality requirement.  The predominance inquiry under Rule 23(b) is more rigorous, <u>Amchem</u>, 521 U.S. at 624, as it "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  <u>Id.</u> at 623.

### a. California Classes

Plaintiffs argue that the proposed California class members will succeed or fail together because (1) they were all paid on a draw commission basis; (2) they were all paid for the time they worked prior to opening and after closing with commissions earned during time when the store was open; and (3) all of the unpaid hours worked were recorded by Nordstrom.  MMCC at 20.  Plaintiffs note that "[c]lass certification is usually appropriate where liability turns on an employer's uniform policy that is uniformly implemented, since in that situation predominance is easily established."  <u>Kamar</u>, 254 F.R.D. at 399; <u>see also</u> <u>Wren v.</u>

RGIS Inventory Specialists, 256 F.R.D. 180, 204 (N.D. Cal. 2009) (citing Kamar, 254 F.R.D. at 399); Kurihara v. Best Buy Co., 2007 U.S. Dist. LEXIS 64224, at *28 (N.D.Cal. 2007) ("[C]ourts' discomfort with individualized liability issues is assuaged in large part where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability.").

Plaintiffs concede that the issue of damages is an individualized issue inherent in this case but argue that it does not defeat class treatment. MMCC at 20. "In cases where there are both individualized inquiries and common questions, courts are more willing to certify classes where the individualized inquiries relate to damages than where they relate to liability." Wren, 256 F.R.D. at 204 (citing Kurihara, 2007 U.S. Dist. LEXIS 64224, at* 9); see also Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975) ("The amount of damages is invariably an individual question and does not defeat class action treatment."). Plaintiffs rely heavily on Kurihara v. Best Buy Co., a case in which employees were not paid for the additional time that they remained at the defendants' stores for inspections meant to reduce shrinkage. See Kurihara, 2007 U.S. Dist. LEXIS 64224, at *9-10. In that case, the court held that plaintiffs met the predominance requirement by providing "substantial evidence of the existence of a company-wide policy whereby employees are subject to inspections, and not compensated for the time spent on those inspections." Id. at 29. Small variances in the amount of damages due or in the amount of time that Kurihara plaintiffs were prevented from making commissions did not defeat class certification. Id. at 29. Plaintiffs therefore contend that the Maraventano Class and the Balasanyan California Class and California Subclass should be certified because the variances among prospective members of the California Classes are small. MMCC at 20; BMCC at 19.

Nordstrom counters that courts routinely deny class certification where liability and damages assessments turn on individual issues. First, Nordstrom relies on Marlo v. UPS, Inc., 639 F.3d 942 (9th Cir. 2011), in which the Ninth Circuit declined to certify a class whose members had allegedly been improperly characterized as exempt employees and should have received meal breaks and overtime. The Ninth Circuit found that common issues did not predominate in the class because deposition testimony submitted by the parties suggested that variations in job duties were attributable to employees working at different facilities, under different managers, and with different customer bases. See id. at 949. Yet, Nordstrom fails to note that the Ninth Circuit also declined to certify the class in Marlo because the policies and procedures presented did not establish whether the proposed class of employees was actually primarily engaged in exempt activities during the work week. See id. at 948. That part of the Ninth Circuit's opinion has more bearing here.

Another case upon which Nordstrom relies is Wang v. Chinese Daily News, 709 F.3d 829 (9th Cir. 2013). In Wang, the Ninth Circuit remanded a case that had been certified in light of Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541 (2011), highlighting four areas for reconsideration: (1) Rule 23(a)'s commonality requirement, (2) Rule 23(b)(2)'s requirement that monetary relief not predominate over claims for injunctive relief, (3) Rule 23(b)(3)'s predominance requirement, and (4) damages. See Wang, 709 F.3d at 832-36. The Ninth Circuit did not, however, hold that a Rule 23(b)(3) class could not be certified in that case.

With respect to Rule 23(b)(3)'s predominance requirement, the Ninth Circuit instructed the district court in Wang to review its conclusion that common questions predominated by analyzing the balance between individual and common

issues.  See Wang, 709 F.3d at 835.  The Ninth Circuit's Wang opinion

emphasized Dukes' holding disapproving of "trial by formula," "wherein damages

are determined for a sample set of class members and then applied by

extrapolation to the rest of the class 'without further individualized proceedings.'"

See Wang, 709 F.3d at 836 (citing Dukes, 131 S. Ct. at 2561).  Specifically, the

Supreme Court's holding in Dukes disapproved of the proposal in which a

"sample set of the class members would be selected, as to whom liability for sex

discrimination and the backpay owing as a result would be determined in

depositions supervised by a master.  The percentage of claims determined to be

valid would then be applied to the entire remaining class, and the number of

(presumptively) valid claims thus derived would be multiplied by the average

backpay award in the sample set to arrive at the entire class recovery--without

further individualized proceedings."  Dukes, 131 S. Ct. at 2561.

Citing Pryor v. Aerotek Scientific, LLC, 278 F.R.D. 516, 536 (C.D. Cal.

2011), Nordstrom notes that "the court denied certification of an off-the-clock,

unpaid wages claim because of significant variations in how early employees

arrived, when they logged onto their computers and how long it took them to log

in, among other facts."  Opp. MMCC at 12.  Specifically, the Pryor class was not

certified because it was composed of employees who were encouraged but often

did not arrive at least five minutes prior to their shift (when they could start

working) and whose time may have already been compensated through that

company's rounding policy.  See Pryor v. Aerotek Scientific, LLC, 278 F.R.D. at

534-37 ("There appears to be significant variation in how early employees arrived,

how early they logged onto their computers, how long it took them to log into

other programs before logging into VCC, whether they performed non-work

activities after their computer logons, and how they rounded their time."). Unlike the present matter, the early arrivals in <u>Pryor</u> were unrecorded and therefore difficult, if not impossible, to reconstruct. The amount of time that employees were expected to arrive early in <u>Pryor</u> varied significantly more than the time that Nordstrom employees are expected to stay before or after Nordstrom's posted hours.

Next, Nordstrom contends that courts have previously denied class certification in piece-rate cases, which Nordstrom asserts are similar to the case at hand. For example, Nordstrom cites <u>Espenscheid v. DirectSat USA, LLC</u>, 705 F.3d 770 (7th Cir. 2013), a case in which the Seventh Circuit declined to certify a class of technicians who installed and repaired satellite dishes. The technicians, who were paid per job, complained that they had to perform duties unrelated to repair orders and that their piece-rate compensation did not compensate them for these duties. <u>See</u> <u>id.</u> at 773-74. The court declined to certify a class, in part, because the technicians had no records of the time they had worked. <u>See</u> <u>id.</u> at 774-75. However, this matter is distinguishable as the <u>Espenscheid</u> plaintiffs had asserted FLSA violations, not California labor law violations. This court has already dismissed the <u>Balasanyan</u> Plaintiffs' FLSA claim, and California labor laws materially differ from FLSA. The matter at hand is also distinguishable because the disputed time has been recorded and can be easily examined, which was not the case for the disputed unpaid time in <u>Espenscheid</u>.

Nordstrom also relies on another piece-rate case, <u>Hughes v. WinCo Foods</u>, 2012 U.S. Dist. LEXIS 2469, at *17, *26 (C.D. Cal. Jan. 4, 2012), in which the court declined to certify a meal period claim because evidence confirmed that meal periods were taken at varying times depending on the store, department,

manager, shift, and day. However, the plaintiffs in <u>Hughes</u> could only point to a policy that required them to obtain management approval to take a break, and that policy did not, on its face, violate California law as it did not explicitly prevent employees from taking a break. The court found that plaintiffs had not explained how this policy had affected putative class members. <u>See</u> <u>Hughes</u>, 2012 U.S. Dist. LEXIS 2469, at *26. <u>See also</u> <u>Gonzalez</u>., 281 F.R.D. at 462 (denying certification for a certain subclass because "[p]laintiffs ha[d] not shown that there was a common policy that pervaded the entire company where Project Managers prevented employees from taking meal breaks and did not authorize and permit employees to take rest breaks").

Like <u>Hughes</u>, Nordstrom argues that the ability to make sales during pre-opening and post-closing times and stock assignments turns on individual issues. Nordstrom argues that its practices related to hours and tasks performed during pre-opening and post-closing hours vary from store to store. For example, Nordstrom cites several declarations regarding varying pre-opening and post-closing hours. <u>See, e.g.</u>, Nguyen Decl., ¶ 4 ("Our store opens 15 minutes before the posted opening time each day, so customers are free to come in and make purchases during that time."); Galindo Decl., ¶ 6 ("Another example is a customer who recently did not even start a fitting room until 9:05 p.m., and ultimately did not make her purchase until 9:30 p.m. The posted store closing time on that day was 9:00 p.m."). In addition, Nordstrom explains that salespeople "can ring up sales when the stores are not open for a wide variety of reasons, including personal appointments, sales over the phone, ringing up pre-sales on the first day of an event or sale, ringing up merchandise placed on reserve and arranging for direct-to-customer shipments, for example." Opp.

MMCC at 14.  The court remains unclear about the actual frequency of such opportunities, whether they are available to all employees or only employees in certain departments, whether the actual work for the sales had taken place during Nordstrom's posted hours, or whether employees could readily generate such sales opportunities for themselves during those times.[8]

In addition, Nordstrom cites several California state cases in which state courts have declined to certify allegedly similar class actions.  Nordstrom principally relies on a later order in <u>Armenta</u> denying class certification because the employees were not required to use a company truck to head to job sites and an analysis of productive and non-productive time required individualized considerations.  <u>See</u> <u>Armenta v. Osmose</u>, unpublished opinion, Opp. MMCC, Ex. 3.  However, in <u>Armenta</u>, the unproductive time was unrecorded and followed no consistent pattern, which therefore required individual inquiries about the amount of time each employee spent doing non-productive work.  Again, that is not the case here.  The other California state cases cited by Nordstrom are similarly flawed.  <u>See</u> <u>Ortega v. Sears, Roebuck and Co.</u>, 2011 Cal. App. Unpub. 3923 (May 24, 2011) (denying class certification because individualized hour-by-hour analysis of each employee's work was required to determine whether or not they had received at least minimum wage); RJN, Ex. 5, Order Granting Motion to De-Certify Class in <u>Carson v. Knight Trans., Inc.</u>, Tulare Superior Court Case No. 234186 (decertifying class due to need for individual

---

[8] For example, a salesperson ringing up a sale to a customer who found an item they wanted to purchase on Thursday, but knew that the item would be on sale the following day.  Although the sale might be "rung up" during pre or post-closing time, the actual work would have been done during sell time.  In addition, such opportunities might be limited and might only arise if a customer for some reason delayed buying an item.

inquiries into the verbal agreement to which each employee agreed and unclear payment calculations).

Plaintiffs counter by citing a recently published California Court of Appeal case, Bluford v. Safeway Stores, Inc., 216 Cal. App. 4th 864 (2013), which affirmed Armenta and agreed that "averaging pay to comply with the minimum wage law instead of separately compensating employees for their rest periods at the minimum or contractual hourly rate . . . is not allowed under California labor law." Id. at 872. In Bluford, Safeway drivers were required to take a 30 minute meal period no later than five hours after their regular shift began. See id. at 867. Although their wage statements were itemized, the wage statements did not include pay for rest periods or specifically account for them and omitted essential information that would have allowed a driver to determine if he had been paid the proper wages due to him under the compensation system. See id. at 868. Given that the court found that California labor law requires employers to provide employees with paid rest breaks, the California Court of Appeals certified the plaintiffs' class. See id. at 874. Unlike the cases cited by Defendants, Bluford discussed and applied Armenta and relied upon wage statements.

In addition, Plaintiffs note that the Ninth Circuit recently rejected the notion that individualized damages could serve as a basis for denying certification. See Leyva v. Medline Indus., 716 F.3d 510, 2013 U.S. App. LEXIS 10649, at *4-5 (9th Cir. 2013). Leyva involved several wage-related violations, including rounding violations, bonus violations, waiting time penalties, and wage statement penalties. See id. at *3-4. There, the Ninth Circuit held that the need for individualized damages determinations, which is necessary in nearly all wage-and-hour class actions, cannot be used, by itself, to defeat class certification

under Rule 23(b)(3).  See id. at *10.  Finally, Plaintiffs seek injunctive relief, a prospective remedy which, if liability is established and Nordstrom's policies are invalidated, will inure to the entire putative class.  Such a result would not require individualized damage assessments.

To bolster its argument that predominance has not been met, Nordstrom also submitted a declaration by an expert, Steven Boedeker.  Opp. MMCC, Decl. Boedeker.  His declaration contains a new study that was not included in the previously submitted Boedeker expert report[9] and that was allegedly provided to Plaintiffs after the January 18, 2013 deadline for expert disclosure related to class certification.  Indeed, Boedeker's declaration was signed on April 18, 2013 and was not filed with Defendants' opposition to Plaintiffs' motion for class certification until the following day.  Boedeker's new study was therefore not provided to Plaintiffs until at least 3 months after the discovery deadline for filing expert reports for class certification.  See Maraventano, Dkt. 78 (order indicating deadline to provide opposing counsel with expert reports for class certification).  Plaintiffs rightfully complain that Boedeker's declaration goes well beyond the scope of his expert report, which only analyzed sales transaction data for Maraventano, Kurji, Balasanyan, and Nalbandian.  See Maraventano, Dkt. 81, Decl. Boedeker; Balasanyan, Dkt.78, Decl. Boedeker.  The court therefore strikes Boedeker's declaration.[10]

---

[9] Boedeker's original expert report was submitted to the court with Nordstrom's motions for reconsideration.

[10] Ironically, Nordstrom objects to the declarations submitted by Plaintiff's attorney Matthew Archbold because it purportedly constitutes new evidence, analyzes (allegedly inaccurately) the new evidence offered up by Nordstrom's expert Boedeker, and contains unauthenticated hearsay.  See Dkt. 114.  The court did not rely on Archbold's declaration in this order as it was unnecessary to do so because the court is striking Boedeker's report from the record.

Yet, looking beyond the declaration's untimeliness, the methodology behind Boedeker's declaration and the new study contained therein appear to be deeply flawed and would not likely be admissible under <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579, 597 (1993) (requiring court to act as a "gatekeeper" to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable). The new study surveys the percentage of time 525 employees were able to sell to customers up to 40 minutes before opening and 40 minutes after closing as well as that percentage for the first 30 minutes of a shift prior to opening and the last 30 minutes of a shift after closing. It is unclear whether the employees were randomly selected or even whether the population of employees was statistically significant (assuming that the selection was random, which, again, is unclear).[11] The court cannot tell how many of Nordstrom's stores would have been covered by this survey or why the survey only covered six months of the year.

Other problems abound, such as the possibility that the posted hours used by Boedeker were more likely inaccurate due to the back-to-school and holiday shopping seasons and other unaccounted-for sales and/or events. For example, the increase of an hour to stores' hours after Thanksgiving is arbitrary and does not appear to have any basis in fact. For that matter, it is unclear whether employee

---

Nevertheless, the court notes that Plaintiffs were not timely provided with Boedeker's new study and that Archbold's analysis was, at least in part, offered so late as a direct result of Nordstrom's failure to timely disclose Boedeker's study.

[11] The Declaration of Kin Lau, submitted by Nordstrom with its opposition to Plaintiffs' motions for class certification, does not explain how these 525 employees were selected, although it appears that Lau was responsible for providing the data for Boedeker's analysis.

purchases are included in these figures or whether they should be included. Such concerns are appropriate, especially when considering the Ninth Circuit's holding in <u>Marlo</u>, 639 F.3d at 948-49 (declining to rely on a survey where the expert was unable to testify whether the sample was representative and where the reliability of the survey was questionable). Such "'litigation-driven' selective sampling of employees and other data are insufficient to inject fatal uncertainty into the question of liability." <u>Kurihara.</u>, 2007 U.S. Dist. LEXIS 64224, at*28 (citing <u>Tierno v. Rite Aid Corp.</u>, 2006 U.S. Dist. LEXIS 71794, at *8 (N.D. Cal. Aug. 31, 2006)).

The court also has concerns about Boedeker's findings. Even when the analysis is restricted to the first 30 minutes of pre-opening time and the last 30 minutes of post-closing time, Nordstrom contends that employees made sales approximately 20 percent and 47 percent of the time respectively. Opp. MMCC, Boedeker Decl. ¶¶ 16, 17. Nordstrom provided a graph showing the distribution for its analysis of sales completed within the full 40 minutes of pre-opening and post-closing time, but no such graph for the 30-minute sets. As such, the court cannot tell whether Nordstrom's analysis is skewed by outliers. Given the previous concerns about how hours were determined, the court also has concerns about relying on these statistics. While Nordstrom may ultimately be able to show that Plaintiffs were able to sell during pre-opening, post-closing, and stocking time, Boedeker's highly deficient studies do not conclusively show that variation existed amongst salespeople. If Nordstrom is later permitted to add this study into the record, the court strongly encourages Nordstrom to address the court's concerns.

36

As it has previously done, Nordstrom again explains that its sales process involves "countless tasks, including, for example, calling customers to let them know about merchandise or special events, pulling items for customers, exchanging emails with customers about items that they want to buy, searching for merchandise online or in other stores that is not available, writing thank you notes, [and] checking on alterations and merchandise being shipped directly to the customer." Id. at 14-15. Nordstrom also argues that it does not track what work is being performed during non-sell time and argues that the court must assess "if salespeople clocked into non-sell [time] for any time when they were allegedly precluded from selling." Id. at 16. The argument is that pre-opening and post-closing tasks can be attributed to the sales process and that salespeople are therefore not precluded from selling. However, the court already rejected this argument when it denied Nordstrom's motion for summary judgment. See Dkt. 76 at 8-10 (explaining that Armenta v. Osmose, 135 Cal. App. 4th 314 (2005), and its progeny have rejected this argument).

Nordstrom further contends that violations of California Labor Code §§ 203 and 226 require fact-intensive inquiries about its state of mind and are therefore inappropriate for class action adjudication. Under California Labor Code § 203, employers owe waiting time only if they "willfully" failed to pay all wages due. MMCC at 17. "An employer's good faith mistaken belief that wages are not owed may negate a finding of willfulness." Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc., 102 Cal. App. 4th 765, 782 (2002). Nordstrom notes that at least one other district court has found that California Labor Code § 203's required finding of willfulness "raises an inherently fact intensive inquiry focusing on state of mind and surrounding circumstances." In re

Taco Bell Wage & Hour Actions, 2011 U.S. Dist. LEXIS 109169, at *15 (E.D. Cal. 2011).  Nordstrom explains that this is because evaluating penalties "will require assessment[s] of whether salespeople reported alleged unpaid non-sell wages and were or were not timely paid for them."  MMCC at 18.

California Labor Code § 226(a) requires employers to provide employees with "an accurate itemized statement in writing" showing, among other things, total hours worked" and "all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate."  Nordstrom noted that another district court decertified a class alleging violations of California Labor Code § 226(a) because it also required individualized inquiries as to damages.  See Cole v. CRST, Inc., 2013 U.S. Dist. LEXIS 32793, at *13 (C.D. Cal Mar. 5 2013).  But the court notes that the district court in Cole also decertified a California Labor Code § 226(a) claim because it had previously decertified the plaintiffs' minimum wage claims earlier in the same order.  See id.

As discussed above, the Ninth Circuit permitted similar claims to be brought by a class in Leyva.  See Leyva, 2013 U.S. App. LEXIS 10649, at *4 and 10.  Plaintiffs' minimum wage claims also remain intact.  The only other reason to not certify these classes is the need to engage in individualized inquiries to determine damages, which is an insufficient reason to deny class certification. See Leyva, 716 F.3d 510, 2013 U.S. App. LEXIS 10649, at *3-4, *14-15. Nordstrom's request that the court decline to certify this motion is therefore denied.

Here, the court finds that Plaintiffs have identified a Nordstrom's policy which provides that salespeople be compensated with commissions during pre-opening and post-closing when they may not be able to sell to customers.  The

38

common factual issue is whether employees were in fact precluded from earning a commission during those pre-opening and post-closing periods.[12] Plaintiffs have provided some expert analysis indicating that Plaintiffs were unable to make sales during the contested periods.[13] Nordstrom has not provided sufficient and uncontroverted evidence to demonstrate that its salespeople were able to engage in sales during pre-opening or post-closing hours. See Kurihara, 2007 U.S. Dist. LEXIS 64224, at *28 (holding that a selective sample was insufficient to inject fatal uncertainty on question of liability). That individualized determinations of damages may be necessary is insufficient reason for the court to decline class certification per Leyva. Analyzing Nordstrom's wage policies is also inherently more objective than the inherently subjective analysis called for in cases like Dukes, where no official company policy applied. Assuming that employees are unable to earn a commission during those times, the common legal issue previously addressed by this court in its order denying summary judgment is

---

[12] Plaintiffs have wrongly concluded that the court's order denying Nordstrom's motions for summary judgment included a factual determination that Nordstrom's employees were not being compensated for that time. See, e.g., MMCC; BMCC at 2. That is not the case. The court found that Nordstrom had failed to show that its salespeople could readily earn a commission during those periods. Plaintiffs should not assume that they have met their factual burden. Rather, sufficient factual support exists for Plaintiffs to be granted class certification and proceed with their cases, barring additional evidence indicating that Plaintiffs were in fact able to earn a commission during pre-opening, post-closing, and stocking time.

[13] Specifically, Plaintiffs rely on the expert report of Kirk Marangi, which analyzes Plaintiffs' sales transactions to determine whether they were made during the contested periods. See Dkt. 91, Marangi Decl. Marangi's report indicates that sales were made infrequently during the contested times. See id. (finding that, during the 40 to 11 minutes prior to opening and the 11 to 40 minutes after closing, the following sales were made by Plaintiffs: Maraventano 4 out of 28 days; Kurji 0 out of 3 days; Balasanyan 0 out of 81 days; and Nalbandian 1 out of 69 days). The court has concerns about this report as well, including Marangi's failure to specify what is meant by the numbers 808, 9988, 9989, and 9900 to 9999. Clarifications for the court should be submitted if and when Plaintiffs rely on Marangi's report again.

whether Plaintiffs could be compensated with commissions when they were allegedly unable to make commissions during the pre-opening, post-closing, and stocking times. The court therefore grants class certification for the <u>Maraventano</u> Class and the <u>Balasanyan</u> California Class as their claims relate to time worked prior to opening and after closing.

This analysis, however, does not apply to Plaintiffs' allegations regarding stock assignments performed during store hours. Although Plaintiffs' claims related to stock assignments are based on Nordstrom's company-wide policy, several factors differentiate Plaintiffs' claims related to stocking time performed during store hours. First, managers had discretion over whether to assign an employee a stock assignment. The frequency of such assignments appears to have varied from store to store, department to department, and manager to manager. Second, the amount of time that each salesperson spent on such assignments varied, depending on the task at hand. Third, stock assignments were performed before, during, and/or after Nordstrom's posted store hours, making it difficult to determine the amount owed to each prospective plaintiff as Plaintiffs' claims overlap. Finally, time spent on stock assignments was not recorded, making it difficult to establish the extent of liability. As a result, the court declines to certify the California classes' claims related to stock assignments completed during store hours.

**b. Nationwide Class**

The <u>Balasanyan</u> Plaintiffs contend that its Nationwide Class meets the predominance requirement because Nordstrom violated the terms and conditions of its own contracts, which provided that employees would receive non-sell time compensation for meetings. The <u>Balasanyan</u> Plaintiffs allege that they were not

40

paid hourly wages for stock assignments exceeding 30 minutes per shift and for meetings attended. They further submit that this is a company-wide policy and provide several declarations indicating that employees were unable to clock in meeting and stock assignments lasting over 30 minutes.[14] Nordstrom counters that "[e]valuating those questions is complicated by the fact that how often salespeople have stock assignments and attend meetings varies." Opp. BMCC at 18. Moreover, Nordstrom cites its policy that employees should record such time as non-sell time.

Balasanyan Plaintiffs' proposed Nationwide Class does not meet the predominance requirements as no potentially violative company-wide policy exists. See Dukes, 131 S. Ct. at 2556-57 ("Because respondents provide no convincing proof of a companywide discriminatory pay and promotion policy, we have concluded that they have not established the existence of any common question."). The Balasanyan Plaintiffs have offered no evidence indicating a uniform, nationwide unofficial policy preventing employees from recording meeting time and stock assignments in excess of 30 minutes as non-sell time.

---

[14] Balasanyan Decl. ¶ 7 ("The only time I recall being required to insert a code is when I was asked to attend certain meetings, such as Nordstrom's yearly anniversary sale meetings."); Beonzi Decl. ¶ 9 ("During each shift, I would perform more than thirty (30) minutes of stock assignments, and at times I would spend up to one (1) hour per shift on stock assignments. I do not recall ever being told to clock in on my hourly rate when I performed more than thirty (30) minutes of stock assignments during a shift."); Mahdi Decl. ¶ 7 ("I was not instructed by my manager to clock in under my hourly rate when I performed more than thirty (30) minutes of stock assignments during a shift. I could not clock in under my hourly rate unless I had my manger's permission first."); Rago Decl. ¶ 6 ("In fact, on one occasion I attempted to clock in on an hourly basis in connection with performing such duties, but was told by my manager that this was not permitted."); Hertel Decl. ¶9 ("My manager never authorized me to clock in on an hourly or "non-sell" rate when I performed more than thirty (30) minutes of stock assignments during a shift.").

Without more information, possible variations in policy and practice amongst stores, departments, and even managers are essentially immeasurable.

The court would need to examine the practices at each store or even each store's department, which may not be uniform. The <u>Balasanyan</u> Plaintiffs have failed to demonstrate that meetings are held at regular, predetermined intervals, thereby creating much greater variance within the proposed <u>Balasanyan</u> California Subclass. Similarly, determining the frequency of stock assignments lasting more than 30 minutes and management's consent (or lack thereof) to record such excess time as non-sell time would require an individualized inquiry to establish liability. Together, these two problems indicate that <u>Balasanyan</u>'s proposed Nationwide Class has not met Rule 23(b)(3)'s predominance requirement and therefore cannot be certified.

**2. Superiority**

Rule 23(b)(3) requires the Court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Considerations pertinent to this finding include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

42

Fed. R. Civ. P. 23(b)(3)(A)-(D).  The superiority requirement tests whether

"classwide litigation of common issues will reduce litigation costs and promote

greater efficiency."  Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th

Cir. 1996).  "If each class member has to litigate numerous and substantial

separate issues to establish his or her right to recover individually, a class action is

not 'superior.'"  Zinser, 253 F.3d at 1192.

Plaintiffs claim that all of the aforementioned superiority considerations are

met.  Plaintiffs first argue that class members have a less-than-normal interest in

individually asserting individual claims because the financial gain is not

sufficiently significant.  See In re N. Dist. Cal., Dalkon Shield IUD Products Liab.

Litig., 693 F.2d 847, 856 (9th Cir. 1982).  Plaintiffs argue that each individual

class member only stands to gain about $5.00 per day of the violation (or

$1,250.00 per year assuming that employee worked 5 days per week).  MMCC at

21; BMCC at 23.  Even if the employee had worked for years, the damages would

not be sufficiently sizeable to defeat class treatment.

Second, Plaintiffs argue that, other than these two pending actions, they are

unaware of any other pending matter filed on behalf of any former or current class

member involving the same claims.  MMCC at 22; BMCC at 23.  Noting that the

purpose of the second factor is to assure judicial economy and reduce the

possibility of multiple lawsuits, Plaintiffs contend that this argument weighs in

their favor.  MMCC at 22; BMCC at 23.

Third, Plaintiffs note that Nordstrom has 32 stores in California, thereby

increasing the desirability of litigation  in this court.  MMCC at 22; BMCC at

23-24.

Fourth, Plaintiffs contend that the case is "manageable" because Plaintiffs' claims are sufficiently legally similar to justify certification, individualized inquiries regarding liability are not required, and the class is sufficiently well-defined.  MMCC at 23-24; BMCC at 23.  Plaintiffs note that Nordstrom has contact information for its former and current employees, thereby facilitating meaningful notice to the prospective class members.  MMCC at 24; BMCC at 23. Finally, Plaintiffs note that "[m]any courts have found that wage claims are 'especially suited to class litigation.'"  Ramos v. SimplexGrinnell LP, 796 F. Supp. 2d 346, 359 (E.D.N.Y. 2011); Alonzo v. Maximus, Inc., 275 F.R.D. 513, 527 (C.D. Cal. 2011); McKenzie v. Federal Express Corp., 275 F.R.D. 290, 302 (C.D. Cal. 2011).

Nordstrom contends that a class action is not superior because: (1) a class proceeding would violate their due process rights; (2) putative class members are potentially biased because they have a financial interest in the outcome; (3) Plaintiffs have failed to present trial plans; and (4) Plaintiffs have an adequate alternative means to recover unpaid wages (i.e., arbitration).  MMCC at 23-25; BMCC at 20-23.  These arguments do not directly address any of Rule 23's superiority requirements, but the court nevertheless discusses each argument in turn below.

Nordstrom contends that its due process rights would be violated by a "trial by formula."  Dukes, 131 S. Ct. at 2561 (rejecting "trial by formula," which would have entailed sampling class membes to assess the percentage of valid claims); Espenscheid, 705 F.3d at 776 (declining to use the testimony of 42 "unrepresentative" representatives' testimony and other evidence to assess damages).  Nordstrom also argues that "[t]here is also a risk of bias in a survey of

putative class members because they have a financial interest in the outcome, which courts recognize as bias." Opp. BMCC at 22. Nordstrom notes that "a defendant is deprived of due process when judged by a person who 'has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.'" Brown v. Vance, 637 F.2d 272, 278 (5th Cir. 1981) (quoting Tumey v. Ohio, 273 U.S. 510, 523 (1927)). But the court has already distinguished both cases from the matter at hand as both Dukes and Espenscheid involved more subjective assessments. The purpose of Rule 23's class certification requirements is to only certify class actions where the defendant will not be disadvantaged by the inability to address claims or assert defenses applicable against particular prospective class members. Legal and factual issues sufficiently predominate, thereby mooting this concern. Thus, the court flatly rejects this argument, especially as Nordstrom's argument suggests that class actions should never be certified because they would necessarily violate due process. That result is unmerited and undesirable.

Nordstrom next argues that Plaintiffs have failed to provide the court with a trial plan as required by Gartin v. S&M NuTec LLC, 245 F.R.D. 429, 441 (C.D. Cal. 2007) (requiring Plaintiffs to provide a trial plan when seeking class certification to manage the varied cases within the class). See also Zinser, 253 F.3d at 1189 (finding that "[b]ecause [plaintiff] seeks certification of a nationwide class for which the law of forty-eight states potentially applies, [plaintiff bore] the burden of demonstrating 'a suitable and realistic plan for trial of the class claims.'"). Here, the court has already declined to certify the Balasanyan Plaintiffs' Nationwide Class. The remaining classes involve only California

plaintiffs and claims. Accordingly, no class plan is required to demonstrate that this case is manageable because the litigation will center on only one state's laws.

Nordstrom's argument that Plaintiffs may recover unpaid wages through individual arbitration has no bearing if the court concludes that class certification is proper. Opp. MMCC at 25. Although Nordstrom is correct that alternate forums may offer a faster, less formal resolution of wage claims, Nordstrom has cited no authority that would compel this court to not certify a class based on the mere availability of that alternate forum.

The court agrees that Plaintiffs have met the requirements for superiority and declines to adopt any of the arguments Nordstrom has made. The court recognizes that each prospective class member's possible recovery may be relatively small. The court further agrees that the Southern District of California is an appropriate forum because the proposed classes are located exclusively in California.[15]

## IV. EFFECT OF BINDING DISPUTE RESOLUTION AGREEMENT

Nordstrom contends that a "significant portion of putative class members are subject to Nordstrom's June or August 2011 binding Dispute Resolution Agreements ("DRA"), which require individual arbitration of the claims at issue." Opp. MMCC at 19; Opp. BMCC at 19. Nordstrom further argues that at least one court has declined to certify a class where "the evidence currently before the [c]ourt supports an inference that a significant number [of plaintiffs signed arbitration agreements], and that a significant portion of this litigation

---

[15] The court is not addressing concerns regarding the superiority of the Nationwide Class, which, for the reasons already stated, the court will not certify.

would be devoted to discovering which class members signed such agreements and enforcing those agreements, rather than to the resolution of plaintiffs' legal claims." Pablo v. Servicemaster Global Holdings, Inc., 2011 U.S. Dist. LEXIS 87918, at *6 (N.D. Cal. 2011). Alternatively, Nordstrom argues that the court may elect to exclude salespeople who were hired after the DRA and who therefore have no existing rights to participate in these class actions.[16]

The Maraventano Plaintiffs claim that Nordstrom's argument "ignores the [c]ourt's March 8, 2012 holding that the DRA itself is invalid because it constituted an improper class communication, and that imposition of the agreement was confusing in and of itself." Reply MMCC at 3 n. 7 (citing Balasanyan v. Nordstrom, Inc., 2012 WL 760566, at *2, n. 3 (S.D. Cal. March 8, 2012)). They further contend that Nordstrom has failed "to present any evidence showing that the foregoing confusing circumstances were not applicable to employees hired after June 2011. Regardless, [they argue that] the DRA does not create individual issues for anyone hired before June 2011, rendering Nordstrom's argument untenable."

Pablo, the only authority provided by Nordstrom, is a case where the court later discovered that "numerous arbitration agreements were signed by defendants and their employees, as well as affidavits stating that defendants have utilized these agreements for at least the past eight years." Pablo, 2011 U.S. Dist. LEXIS 87918, at *5. That is not the situation here for new employees who have signed the DRA well after this case was filed. Nordstrom cites no authority that

---

[16] Nordstrom recognizes that the court has previously refused to enforce the DRA as to putative class members hired before July 2011 under Rule 23 because it deprived them of an existing right to participate in the suit by not informing them about the impact of the DRA on the lawsuit. See Balasanyan, Dkt. 64.

would permit a defendant to reduce their liability by having new potential Class Members sign arbitration agreements. Nevertheless, the court concedes that Nordstrom was engaging in a standard practice that many companies engage in when hiring new employees. Accordingly, the court holds that new employees who signed the DRA upon becoming employed by Nordstrom may be properly excluded from the class. Prospective California Class Members who were employed prior to Nordstrom's use of the DRA may not be excluded from the class nor may the California Class Period be modified to reflect the signing of the DRA, which was an improper communication.

## V. PROPOSED CLASS NOTICES

Finding this motion to approve proposed class notices as premature, the court declines to approve the proposed class notices without prejudice. Plaintiffs may renew their motions at a later date.

## VI. CONCLUSION

For the aforementioned reasons, the motions for certification are granted for the proposed <u>Maraventano</u> and <u>Balasanyan</u> California Classes and denied for <u>Balasanyan</u>'s proposed California Subclass and Nationwide Class. The court also strikes the Boedeker Declarations (<u>Maraventano</u>, Dkt. 99, Attachment 5; <u>Balasanyan</u>, Dkt. 91, Attachment 8) from the record.

**IT IS SO ORDERED.**
DATED: August 12, 2013

Jeffrey T. Miller
United States District Judge